**UNITED STATES of America, Appellee,**

v.

**Edgar Richard LEWIS, Appellant.**

**No. 76–1950.**

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1977.

Decided Aug. 10, 1977.

---

902

Larry B. Leventhal, Minneapolis, Minn., for appellant.

Daniel M. Scott, Asst. U.S. Atty., Minneapolis, Minn., for appellee; William Zwart, Intern. and Robert G. Renner, U.S. Atty., Minneapolis, Minn., on the brief.

Before LAY and HENLEY, Circuit Judges, and NANGLE,* District Judge.

LAY, Circuit Judge.

Edgar Richard Lewis was convicted on two counts of interstate transportation of

---

* The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

counterfeit securities under 18 U.S.C. § 2314, and eight counts of possession of stolen mail in violation of 18 U.S.C. § 1708. On appeal Lewis challenges the sufficiency of the evidence on all counts. On Counts I and II he contends that the evidence was insufficient to show that he transported the counterfeit cashier checks in interstate commerce. On Counts III through X he urges that the evidence was insufficient to show that he possessed the stolen personal checks with the requisite knowledge. Additionally, he asserts that the trial judge, the Honorable Miles Lord, erred in his examination of a government witness, and in refusing to strike the testimony of defendant's probation officer. We affirm the conviction.

The government's evidence showed that in December 1975 or early January 1976 Lewis planned and organized a scheme to pass stolen personal checks and counterfeit cashier checks in Minneapolis. In furtherance of the scheme Lewis enlisted the aid of Anita Bleizeffer, Clyde Barrett, Michael Hamby and Daniel Hamby. On January 5, 1976, the group met in Chicago and proceeded by car to Minneapolis. Once in Minneapolis they checked into a motel. Lewis and Anita Bleizeffer shared one room and Barrett and the Hamby brothers shared another. Shortly after checking into the motel the group assembled in Lewis' room. Lewis then produced the stolen personal and counterfeit cashier checks and directed the other four to practice forging signatures on the stolen personal checks. After practicing for one-half hour the four unsuccessfully attempted to pass the checks in several banks in Minneapolis. The next day Barrett was arrested when he attempted to cash one of the counterfeit cashier checks. Because of Barrett's disappearance, Lewis and Anita Bleizeffer drove back to Chicago. After being released Barrett met with the Hamby brothers and drove with them to Chicago.

Barrett eventually was granted immunity and the government's case is built on his testimony. The defense produced several witnesses who testified that Lewis was in Denver, Colorado, on January 5 and left for Minneapolis by car late that evening. The Hamby brothers testified that on January 6 they met Lewis by chance in Minneapolis and invited him to their motel room for a party. The Hamby brothers further testified that neither they nor Lewis were involved in the check passing scheme. Anita Bleizeffer was called by the government at the district court's insistence. Although her testimony was confusing and at times inconsistent, it exculpated Lewis.

*Interstate Transportation.*

Lewis first contends that the evidence was insufficient to show that he transported the counterfeit cashier checks from Chicago to Minneapolis. Although there is no direct evidence that Lewis transported the counterfeit cashier checks in interstate commerce, we find sufficient circumstantial evidence from which a jury could reasonably infer that Lewis transported the checks from Chicago to Minneapolis. *Cf. United States v. Frazier*, 545 F.2d 71, 74 (8th Cir. 1976).

Barrett testified that, except for a short period of time after checking into the Minneapolis motel, he was with the defendant from the time Lewis obtained the two packages in Chicago until Lewis produced the counterfeit cashier checks in the Minneapolis motel room. He also testified that Lewis planned the scheme, directed the group's activities, paid all expenses, and was to receive the lion's share of the take. Barrett further testified that neither he nor the Hamby brothers brought the checks to Minneapolis.

We find the evidence showing a chain of custody concerning the packages, the absence of another source, and Lewis' leadership role to be sufficient to support the jury's finding of interstate transportation.[1]

1. Lewis' reliance on *United States v. Owens*, 460 F.2d 467 (5th Cir. 1972), lacks merit. He asserts that a forged instrument is presumed forged where it is first found in its altered state. Thus, he urges there is a presumption the checks were forged in Minneapolis. One

*Possession of Stolen Mail.*

■ There is no dispute that the eight personal checks charged in Counts III through X were stolen from the mail [2] and since knowledge can be inferred from possession, the only issue is whether Lewis had actual or constructive possession of the personal checks. The evidence shows that Lewis transported the checks from Chicago to Minneapolis and that he produced the checks and directed the group to practice forging endorsements in the motel room he shared with Anita Bleizeffer. Two of the stolen checks and practice endorsements for all the checks were later found in this room. We find that there was sufficient evidence that Lewis possessed the stolen checks from which the jury could reasonably infer his knowledge that they were stolen. *Cf. United States v. Steward*, 451 F.2d 1203 (2d Cir. 1971); *United States v. Kearse*, 444 F.2d 62 (2d Cir. 1971); *United States v. Febre*, 425 F.2d 107 (2d Cir.), *cert. denied*, 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970).

*Testimony of David Hopkins.*

■ At the trial several defense witnesses testified that Lewis was in Denver, Colorado, on January 5, 1976, and that he left for Minneapolis by car late that evening. The Hamby brothers testified that by chance they met Lewis in Minneapolis on January 6, 1976. In order to establish that Lewis was in Chicago on January 5, the government planned to call the defendant's probation officer, David Hopkins. Prior to his testimony the defendant objected on

grounds that the probative value of his testimony was substantially outweighed by the danger of prejudice under Fed.R.Evid. 403. The district court overruled the objection, but ordered the witness and the government not to reveal that Hopkins was the defendant's probation officer. The district court instructed the witness to identify himself only as a federal official who saw the defendant at a particular time and place.

On direct examination Hopkins identified himself as a federal official who saw the defendant in Chicago on January 5. On cross-examination the defense questioned Hopkins concerning his records, particularly the entry and order of dates. During cross-examination Hopkins volunteered a statement that he had also visited with the defendant at the Chicago Police Department on January 15. The defense moved to strike Hopkins' testimony on the basis of the unresponsive "police department" answer. The court overruled the objection. On appeal defendant asserts that the district court should have stricken the testimony, because it "cast the defendant as one having prior police involvement and Hopkins as having supervision or administration over him." We disagree. The evidence shows that Hopkins, a federal official, met the defendant in Chicago on January 5 and that on January 15 he visited the defendant at the police department. It was not brought out on either direct or cross-examination that Hopkins was defendant's probation officer.[3] Previous testimony had es-

fatal flaw in this argument is that the checks in Counts I and II were not forged, but counterfeit. Forgery only requires the forger to endorse the check, which can be accomplished very quickly. Counterfeiting a check, on the other hand, is a complicated process involving the printing of the entire check. Thus the reasons for the presumption for forged checks is inapplicable to counterfeit checks.

2. The government proved that on December 29, 1975, approximately 425 pieces of mail were stolen from two mail storage boxes which served the area in which the payees of the checks charged in Counts III through X were located. With the exception of the check charged in Count V, the government proved that the checks were mailed, but did not clear

the bank and were not received. On Count V the government proved that the check was mailed and never cleared the bank, but produced no evidence that it was not received.

3. In his brief defendant cites the following remark from the government's closing argument to the jury:
You look over to Mr. Hopkins. What does he have to gain by falsifying all of this information. Does he have anything to gain by that? *There is a man who works regularly counseling Mr. Lewis, talking to Mr. Lewis, interviewing Mr. Lewis.*
(Emphasis added).
The defense did not object to this statement. Assuming that the argument could be deemed prejudicial, an objection or motion for a mistrial is essential to preserve the error.

tablished that the defendant had been arrested and processed on January 7 and 8. Under the circumstances we find the defendant's contentions to be without merit and that the district court did not abuse its discretion in refusing to strike Hopkins' testimony.

*Testimony of Anita Bleizeffer.*

■ Defendant's final contention concerns the district court's insistence that Anita Bleizeffer be called as a witness and the court's questions and comments during her testimony. Prior to the court's request that she be called the defendant had rested its case. The evidence concerning the defendant's alibi (that he was in Denver on January 5) was conflicting.

Lewis' defense was that he was not involved in any capacity with the check passing scheme and that Barrett implicated him in order to obtain immunity. Jerome Scott, a resident of Denver, Colorado, testified that Lewis stayed with him from December 30, 1975, to late in the evening of January 5, 1976, when Lewis left by car for Minneapolis. Scott's testimony was corroborated by Winifred Spikes, a disabled veteran and resident in the same apartment complex as Scott. In addition Theresa Olsen, the manager of the apartment complex, testified that she showed an apartment to Lewis on January 5. The Hamby brothers testified that on January 6 they met Lewis, who was an old friend, in Minneapolis by chance and invited him to their motel for a party. They testified that Lewis was not involved in the check passing scheme and that Barrett "fingered Lewis" so that he would be granted immunity.

The court, having accepted Bleizeffer's guilty plea, and having sentenced her for her involvement in the scheme, told counsel it felt that the jury should have the benefit of her testimony. The government informed the court that it had elected not to call her since her testimony was not helpful. Defendant's counsel stated that he did not call her since she was not a credible witness and he did not wish to produce her. The court, nonetheless, felt the jury should hear her testimony and indicated he would exercise his prerogative to call her as a court witness and examine her. The government then announced it would call her as a rebuttal witness.

Anita Bleizeffer's testimony was confusing and inconsistent. However, it consistently exculpated the defendant. She testified that she arrived in Minneapolis by bus to work with Barrett in a check passing scheme, and that she met Lewis for the first time at the party in the motel on January 6. She testified that on January 7, when Barrett did not return from attempting to cash a check, she accepted Lewis' offer of a ride to Chicago. While en route to Chicago, Lewis and Bleizeffer were arrested. Lewis was found to have $900 on his person. The government contends that this is the money Bleizeffer received upon successfully cashing a forged check. Bleizeffer testified that she had placed the $900 she had received from cashing the check in a body cavity and that the $900 found on Lewis was his own money. She also admitted her conviction for her part in the scheme and that she was a prostitute.

During her testimony the court questioned her several times and interposed several comments. The defendant contends that the trial judge unfairly impugned her credibility and that his comments were prejudicial, and denied defendant a fair trial. One of the difficulties we have in appraising defendant's contention regarding Bleizeffer's testimony and the court's comments is his failure to object to the calling of the witness by the court and to the court's comments. Nonetheless, although we cannot approve many of the aside comments and questions by the court, we have studied the entire record and do not feel there has been such prejudicial error so as to require a new trial.

The judgment of conviction is affirmed.